[No. B084660. Second Dist., Div. Three. Nov. 27, 1996.]

GERALDINE SOLDINGER, Plaintiff and Appellant, v.
NORTHWEST AIRLINES, INC., Defendant and Respondent.

COUNSEL

Rosenfeld, Meyer & Susman, Todd W. Bonder, Lisa M. Jacobsen, Stacy J. Barancik, Greines, Martin, Stein & Richland, Barbara W. Ravitz and Barry M. Wolf for Plaintiff and Appellant.

Rintala, Smoot, Jaenicke & Brunswick, J. Larson Jaenicke, Alan M. Brunswick and Melodie K. Larsen for Defendant and Respondent.

OPINION

ALDRICH, J.—This case involves the scope of federal preemption under the Railway Labor Act (RLA), 45 United States Code section 151 et seq. The primary question presented is whether an airline employee may pursue available state law remedies against her employer for religious discrimination, retaliation, and failure to accommodate her religious beliefs or whether she may seek redress only through the RLA's arbitral mechanism. Under the facts of this case, we hold the RLA does not preempt the employee's civil lawsuit since her grievance does not grow out of the interpretation or application of her collective bargaining agreement (a "minor dispute"). We therefore reverse the summary judgment granted by the trial court.

### INTRODUCTION

This religious discrimination lawsuit was brought by appellant and plaintiff Geraldine Soldinger against her employer, respondent and defendant Northwest Airlines, Inc. Soldinger appeals from a summary judgment entered in favor of Northwest Airlines.

The issues we address are:

(1) Does the RLA preempt Soldinger's state law (Gov. Code, § 12900 et seq.) allegations of religious discrimination and retaliation?

(2) Does the RLA preempt Soldinger's allegations that Northwest Airlines failed to accommodate Soldinger's religious beliefs (Gov. Code, § 12940, subd. (j)), and does the collective bargaining agreement between Northwest Airlines and Soldinger's union, in itself, constitute an accommodation?

(3) Does the RLA preempt Soldinger's claim for intentional infliction of emotional distress?

(4) Did Soldinger exhaust her administrative remedies with regard to her claim for retaliation?

## FACTUAL AND PROCEDURAL BACKGROUND

■ Since this matter comes to us upon the granting of a summary judgment in favor of Northwest Airlines, we view the facts in the light most favorable to Soldinger. (*PMC, Inc.* v. *Saban Entertainment, Inc.* (1996) 45 Cal.App.4th 579, 590 [52 Cal.Rptr.2d 877].)

### 1. *Soldinger.*

Soldinger was a conservative Jew. Her husband was a Holocaust survivor, having been in a concentration camp during World War II. Their children were educated in religious school and raised in a religious environment. Soldinger kept a kosher[1] home and strictly observed the three major Jewish holidays, Yom Kippur, Rosh Hashanah and Passover. The Soldingers treated these holidays as days of observance. On these holidays, the Soldingers did not drive, answer the telephone or watch television.

Soldinger began her employment with Northwest Airlines in 1977, having her first job with Northwest Airlines's predecessor company. During her fourteen years with Northwest Airlines, Soldinger had never worked on the three major Jewish holidays, which included the first two days of Passover.[2] The celebration of Passover includes a family gathering and a religious ceremony, the Seder. A Seder is held on the first two nights; it can last several hours. Observant Jews take time off for Passover.

### 2. *The bidding procedures and Northwest Airlines Practices.*

Soldinger's employment was governed by a collective bargaining agreement (the CBA) between Northwest Airlines and her union, the International Association of Machinists and Aerospace Workers (the Union).

The CBA controlled the methods by which employees obtained days off. In December of each year, employees bid for their desired vacation for the

---

[1]"Kosher" means "sanctioned by Jewish law. . . . selling or serving food ritually fit according to Jewish law." (Merriam-Webster's Collegiate Dict. (10th ed. 1995) p. 648.)

[2]Passover commemorates the exodus of the Jewish people from Egypt. It is an eight-day holiday for American Jewry. The first two days are the most significant.

next year. Vacation bids, as administered by the Union, were awarded by seniority. Employees also requested individual days off, or "day-at-a-time" (DAT) vacation. Employees submitted such requests no more than 14 days in advance of the date requested off. Ten days prior to the day off requested, employees were informed if the request was awarded or denied. If employees did not receive the time requested, they could trade with other employees. Northwest Airlines did not have a written policy regarding time off for religious holidays.

Northwest Airlines routinely replaced employees who were absent from work. On a daily basis, employees and supervisors covered other employees' shifts. They did this for important reasons and even on short notice. Full-time and part-time employees were used for this purpose. Sometimes, a shift was not completely covered and "people manage[d]."

3. *Soldinger's efforts to be off for Passover and the termination of her employment.*

In December 1990, Soldinger presented her vacation bid for the following year. Her vacation bid requested the week from March 29, 1991, through the following Sunday; this time would include the beginning of Passover (Friday, March 29). Soldinger was unsuccessful in this request because the week had been selected by others with higher seniority.

Soldinger's regular days off were Thursday, Friday and Saturday (March 28-30.) She was able to trade with other employees for time off on Monday, Tuesday and Wednesday (April 1-3). In order to have the complete week off, she needed not to work on Sunday, March 31, 1991, which also happened to be Easter Sunday.

On March 18, 1991, Soldinger submitted a DAT request asking to have March 31, 1991, off. On March 24, 1991, she learned her request had been denied. That day, Soldinger posted a sign on the employee bulletin board stating: " '[D]esperate. Need need Sunday, March 31 off. Will pay back Thursday, Friday, Saturday.' " Seeking to trade days off, Soldinger unsuccessfully asked more than 15 employees to accommodate her.

Also on March 24, 1991, Soldinger asked to speak to Steven Holme, the manager of station operations. Since he was not in his office, Soldinger left a note for Holme. In the note Soldinger asked to take March 31, 1991, off, if necessary without pay, because it was a Jewish holiday.

On March 27, 1991, Holme discussed the note with Soldinger. Soldinger said March 31st was a religious holiday and thus she could not come to

work. Holme said, "You're not here, you're fired." When Soldinger tried to explain, Holme said, "Well, what makes you think it's more important for you to have your holiday off than someone celebrating Easter?" After Soldinger told Holme she could not come to work, the conversation ended. Holme made no attempt to assist Soldinger in securing the day off.

On March 31, 1991, Soldinger did not report to her job in operations at Los Angeles Airport. That day, approximately 50-60 people worked in operations. Eight other employees were qualified to work in that department, but were assigned elsewhere. Northwest Airlines replaced Soldinger that day with two other employees, covering Soldinger's responsibilities with ease. On April 8, 1991, Soldinger was fired. Northwest Airlines claimed Soldinger was fired for being insubordinate and for being "AWOL."

### 4. *Northwest Airlines's treatment of other employees.*

Chris Canale, who was not Jewish, also worked in operations. He had the habit of saying "Hey, Jew. Hey, go Jew him down. Hey you yid."[3] Soldinger had reported these comments to management about four months before she was fired from her job. Canale had not been successful in obtaining March 31, 1991, off. Canale asked his supervisor for the day off because he wanted to go to the mountains. To accommodate Canale's request, the supervisor was able to switch Canale's shift with a third employee.

Northwest Airlines supervisor Renee Kaufman knew of no other employee who had been fired for being AWOL. These employees' trade rights might have been suspended, but the employees were not fired. No other employee who had been insubordinate had been fired. The other insubordinate employees had been disciplined or reprimand letters had been placed in their files. In 1991, nine other customer service agents were fired; none was fired for being insubordinate or AWOL.

### 5. *Grievance, the Department of Fair Employment and Housing proceedings and Soldinger's return to work.*

On April 9, 1991, Soldinger and the Union filed a grievance protesting termination of Soldinger's employment. Northwest Airlines denied the grievance and it was ultimately referred to arbitration, which was held on November 5, 1991. As a result of the arbitration, Soldinger was reinstated with no loss of seniority, but without backpay.

---

[3]"Jew down" is used as a verb to mean "to induce (a seller) by haggling to lower his price." It is usually taken as offensive. "Yid" is a noun synonymous with "Jew," usually taken to be offensive. (Webster's Third New Intern. Dict. (1993) pp. 1215, 2652.)

Soldinger returned to work on March 16, 1992. Dick Schukraft, Northwest Airlines's passenger service manager, told the Union representative Soldinger should not have gotten her job back and he did not want her there. Schukraft made a number of anti-Semitic remarks to another Jewish employee. Schukraft suggested Jews did not have to work because they had money and the other employee should take care of "her people," meaning passengers from New York.

Soldinger tried to return to operations. However, Schukraft refused to allow her to take the required training, claiming no one was receiving the training. Subsequently, however, people were trained for four positions within operations. Schukraft also denied Soldinger bumping rights. When Soldinger tried to bid on a supervisory position, Schukraft gave it to someone with lower seniority.

Soldinger filed two charges with the California Department of Fair Employment and Housing (DFEH). One was filed on April 12, 1991; the second was filed on June 30, 1993. DFEH rejected both charges and issued two right-to-sue letters.

### 6. *Proceedings in the trial court.*

Soldinger filed a civil lawsuit against Northwest Airlines.[4] The complaint as amended alleged three causes of action: (1) tortious discharge and retaliation in violation of public policy pursuant to Government Code section 12940 (the Fair Employment and Housing Act) and the California Constitution; (2) religious discrimination in violation of Government Code section 12940; and (3) intentional infliction of emotional distress. The gravamen of Soldinger's complaint was Northwest Airlines discriminated against her by failing reasonably to accommodate her religious beliefs, terminating her employment for behavior which was normally tolerated and retaliating against her for taking legal action.

Northwest Airlines moved for summary judgment. Northwest Airlines argued it was entitled to judgment as a matter of law because the RLA preempted Soldinger's lawsuit and because Northwest Airlines reasonably accommodated Soldinger's religious beliefs. Northwest Airlines also contended the cause of action for tortious discharge and retaliation in violation

---

[4]The lawsuit also named Steven Holme. However, he was not served and he is not a party on appeal.

of public policy could not be asserted because Soldinger did not exhaust her administrative remedies.[5]

The trial court granted the summary judgment motion. The trial court held there were no triable issues of fact. In so concluding, the trial court held (1) Soldinger's causes of action were preempted by the RLA, (2) Northwest Airlines had reasonably accommodated Soldinger's religious beliefs, and (3) Soldinger's claim of retaliation failed because Soldinger did not exhaust her administrative remedies.

The trial court entered judgment in favor of Northwest Airlines, from which Soldinger appeals. We reverse.

## DISCUSSION

1. *Soldinger's causes of action based upon religious discrimination and retaliation are not preempted by the RLA.*

a. *Preemption and the RLA.*

The RLA, 45 United States Code section 151 et seq., governs railways, airlines and their union employees. (*Westbrook* v. *Sky Chefs, Inc.* (7th Cir. 1994) 35 F.3d 316, 317; 45 U.S.C. §§ 181-188; *Hawaiian Airlines, Inc.* v. *Norris* (1994) 512 U.S. 246-248 [129 L.Ed.2d 203, 207-208, 114 S.Ct. 2239, 2241].) The RLA sets up a mandatory arbitral mechanism to handle disputes ". . . 'growing out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions,' (45 U.S.C. § 153 . . . .)" (*Hawaiian Airlines, Inc.* v. *Norris, supra,* 512 U.S. at p. 248 [129 L.Ed.2d at p. 208, 114 S.Ct. at p. 2241].)

■ "Congress' purpose in passing the RLA was to promote stability in labor-management relations by providing a comprehensive framework for resolving labor disputes. [Citations.]" (*Hawaiian Airlines, Inc.* v. *Norris, supra,* 512 U.S. at p. 252 [129 L.Ed.2d at p. 211, 114 S.Ct. at p. 2243].) Congress wanted to avoid having the states apply their own state law principles to interpret a federal labor law collective bargaining agreement, leading to inconsistent results. "To realize this goal, the RLA establishes a mandatory arbitral mechanism for 'the prompt and orderly settlement' of two classes of disputes. [Citation.] The first class, those concerning 'rates of

---

[5]In the summary judgment motion, Northwest Airlines did not contend there were no triable issues of fact as to whether there was anti-Semitism. In opposition to the summary judgment motion, besides the purported anti-Semitic comments mentioned above, Soldinger brought forth others. For example, a Northwest Airlines supervisor stated every household should have a Jew.

pay, rules or working conditions,' [citation], are deemed 'major' disputes. Major disputes relate to ' "the formation of collective [bargaining] agreements or efforts to secure them." ' [Citation.] The second class of disputes, known as 'minor' disputes, 'gro[w] out of grievances or out of the interpretation or application of agreements covering rates of pay, rules, or working conditions.' 45 U.S.C. § 151a. Minor disputes involve 'controversies over the meaning of an existing collective bargaining agreement [CBA] in a particular fact situation.' [Citation.] Thus, 'major disputes seek to create contractual rights, minor disputes to enforce them.' [Citation.]" (*Hawaiian Airlines, Inc.* v. *Norris, supra,* 512 U.S. at pp. 252-253 [129 L.Ed.2d at p. 211, 114 S.Ct. at pp. 2243-2244].)

Both major and minor disputes are preempted. (*Hawaiian Airlines, Inc.* v. *Norris, supra,* 512 U.S. at pp. 252-254 [129 L.Ed.2d at pp. 210-212, 114 S.Ct. at pp. 2243-2244].) ▮▮▮ The parties do not argue Soldinger's claim is a major dispute. Rather, Northwest Airlines contends the conflict over Soldinger's employment dispute is a minor dispute and thus must be resolved only through the RLA mechanisms. If this is an accurate statement, Soldinger's causes of action for religious discrimination, retaliation and failure to accommodate are preempted.

▮▮▮ Minor disputes do not "mean all employment-related disputes, including those based on statutory or common law." (*Hawaiian Airlines, Inc.* v. *Norris, supra,* 512 U.S. at p. 253 [129 L.Ed.2d at p. 212, 114 S.Ct. at p. 2244].) Rather, "minor disputes" "refers to disagreements over how to give effect to the bargained-for agreement. . . . [¶] . . . [It means] disputes involving the application or interpretation of a CBA." (*Id.* at pp. 254-255 [129 L.Ed.2d at p. 212, 114 S.Ct. at pp. 2244-2245].) "[As contemplated by the RLA,] minor disputes . . . are those that are grounded in the CBA[,] . . . those involving the interpretation or application of existing labor agreements. [Citation.]" (*Id.* at p. 256 [129 L.Ed.2d at p. 213, 114 S.Ct. at p. 2245].) "Minor disputes" are "those that involve duties and rights created or defined by the CBA." (*Id.* at p. 258 [129 L.Ed.2d at p. 215, 114 S.Ct. at p. 2247].)

"Whether federal law pre-empts a state law establishing a cause of action is a question of congressional intent. [Citation.] Pre-emption of employment standards 'within the traditional police power of the State' 'should not be lightly inferred.' [Citation.]" (*Hawaiian Airlines, Inc.* v. *Norris, supra,* 512 U.S. at p. 252 [129 L.Ed.2d at p. 211, 114 S.Ct. at p. 2243].)

▮▮▮ "[There is no] clear and manifest congressional purpose to create a regime that broadly pre-empts substantive protections extended by the

States, independent of any negotiated labor agreement." (*Hawaiian Airlines, Inc.* v. *Norris, supra,* 512 U.S. at pp. 255-256 [129 L.Ed.2d at p. 213, 114 S.Ct. at p. 2245].) Every lawsuit which may relate in some way to a collective bargaining agreement is not necessarily preempted. (*Allis-Chalmers Corp.* v. *Lueck* (1985) 471 U.S. 202, 220 [85 L.Ed.2d 206, 221, 105 S.Ct. 1904].) The preemption determination is considered on a case-by-case basis. (*Ibid.*) "[S]ubstantive protections provided by state law, independent of whatever labor agreement might govern, are not pre-empted under the RLA." (*Hawaiian Airlines, Inc.* v. *Norris, supra,* 512 U.S. at p. 257 [129 L.Ed.2d at p. 214, 114 S.Ct. at p. 2246].)

The RLA does not supplant rights which arise independently from the CBA, even if the rights arise from the same factual scenario. The key is whether the CBA must be interpreted or applied. (*Hawaiian Airlines, Inc.* v. *Norris, supra,* 512 U.S. at pp. 256-258 [129 L.Ed.2d at pp. 213-214, 114 S.Ct. at pp. 2245, 2246].) If the disagreement involves a dispute as to how to effectuate the bargained-for agreement or invoking contract-based rights, it is preempted. (*Id.* at pp. 253-254 [129 L.Ed.2d at pp. 211-212, 114 S.Ct. at p. 2244].)

### (1) *United States Supreme Court decisions.*

The United States Supreme Court has dealt with a number of preemption cases in the context of state actions for wrongful discharge. Its most recent case, *Hawaiian Airlines, Inc.* v. *Norris, supra,* 512 U.S. 246 [129 L.Ed.2d 203, 114 S.Ct. 2239], examined the lawsuit of an aircraft mechanic working for Hawaiian Airlines. In *Norris,* the employee's employment was controlled by a collective bargaining agreement. The employee noticed a tire and wheel condition he considered dangerous. The employee's supervisor rejected the employee's repair recommendation and an alternative procedure was performed. Thereafter, the employee refused to sign a maintenance record certifying the repair had been performed satisfactorily. The employee was immediately suspended, pending a termination hearing. The employee reported the incident to the Federal Aviation Administration. In grievance procedures, the hearing officer accepted the airline's argument that the employee had been insubordinate. Thereafter, the employee was discharged. The employee filed a civil lawsuit alleging two wrongful discharge torts— ". . . discharge in violation of the public policy expressed in the Federal Aviation Act of 1958 and implementing regulations, and discharge in violation of Hawaii's Whistleblower Protection Act, . . ." (*Id.* at p. 250 [129 L.Ed.2d at p. 210, 114 S.Ct. at p. 2242].) The civil lawsuit in the United States District Court was dismissed as preempted by the RLA. In the meantime, the employee filed a second lawsuit in Hawaii State Court. Although the trial court dismissed the state lawsuit as being preempted, the

Supreme Court of Hawaii reversed, "concluding that the RLA did not pre-empt [the employee's] state tort actions." (*Id.* at p. 251 [129 L.Ed.2d at p. 210, 114 S.Ct. at p. 2243].)

The United States Supreme Court rejected the preemption argument and affirmed. "[T]he CBA is not the 'only source' of [the employee's] right not to be discharged wrongfully. In fact, the 'only source' of the right [the employee] asserts . . . is state tort law. Wholly apart from any provision of the CBA, [the airline] had a state-law obligation not to fire [the employee] in violation of public policy or in retaliation for whistleblowing. The parties' obligation under the RLA to arbitrate disputes arising out of the application or interpretation of the CBA did not relieve petitioners of this duty." (512 U.S. at p. 258 [129 L.Ed.2d at pp. 214-215, 114 S.Ct. at p. 2246].)

*Norris* examined the following preemption cases, to demonstrate the RLA did not always deprive employees of independent remedies available under state law.[6]

In *Atchison, T. & S. F. R. Co.* v. *Buell* (1987) 480 U.S. 557 [94 L.Ed.2d 563, 107 S.Ct. 1410] an injured railroad employee sought damages for workplace injuries under the Federal Employers' Liability Act (FELA). The Supreme Court rejected the argument that because the alleged injury resulted from conduct subject to the collective-bargaining agreement, the employee's sole remedy was through arbitration. "The fact that an injury otherwise compensable under the FELA was caused by conduct that may have been subject to arbitration under the RLA does not deprive an employee of his opportunity to bring an FELA action for damages." (*Id.* at p. 564 [94 L.Ed.2d at p. 572].)

In *Lingle* v. *Norge Division of Magic Chef, Inc.* (1988) 486 U.S. 399 [100 L.Ed.2d 410, 108 S.Ct. 1877], ". . . an employee covered by a labor

---

[6]*Norris* "essentially overruled some circuits' prior decisions holding that the RLA's preemption sweep was broader than that of [the Labor Management Relations Act] § 301 [of 29 U.S.C. § 185.].)" (*Fry* v. *Airline Pilots Ass'n, Intern.* (10th Cir. 1996) 88 F.3d 831, 836, fn. 6; accord, *Espinal* v. *Northwest Airlines* (9th Cir. 1996) 90 F.3d 1452, 1456; *Gay* v. *Carlson* (2d Cir. 1995) 60 F.3d 83, 87; *Taggart* v. *Trans World Airlines, Inc.* (8th Cir. 1994) 40 F.3d 269, 272; *Westbrook* v. *Sky Chefs, Inc., supra,* 35 F.3d at p. 317.)

The California Supreme Court analyzed RLA preemption in *DeTomaso* v. *Pan American World Airways, Inc.* (1987) 43 Cal.3d 517 [235 Cal.Rptr. 292, 733 P.2d 614]. *DeTomaso* and a number of other California cases were rendered before *Norris*. (E.g., *Evans* v. *Southern Pacific Transportation Co.* (1989) 213 Cal.App.3d 1378 [262 Cal.Rptr. 416]; *United Airlines, Inc.* v. *Superior Court* (1991) 234 Cal.App.3d 1085 [286 Cal.Rptr. 159].) The standard used in *DeTomaso* was not that delineated in *Norris*. *DeTomaso* used an "arguably governed by" or "not obviously insubstantial relationship to" the collective bargaining agreement test, based upon, the pre-*Norris* case of *Magnuson* v. *Burlington Northern, Inc.* (9th Cir. 1978) 576 F.2d 1367. (*DeTomaso* v. *Pan American World Airways, Inc., supra,* at pp. 527, 529.)

agreement was fired for filing an allegedly false worker's compensation claim. After filing a grievance pursuant to her CBA, which protected employees against discharge except for 'proper' or 'just' cause, she filed a complaint in state court, alleging that she had been discharged for exercising her rights under Illinois worker's compensation laws. The state court had held her state-law claim pre-empted because 'the same analysis of the facts' was required in both the grievance proceeding and the state-court action." (*Hawaiian Airlines, Inc.* v. *Norris, supra,* 512 U.S. at p. 261 [L.Ed.2d at pp. 216-217, 114 S.Ct. at p. 2248].) The Supreme Court reversed. "[W]here the resolution of a state-law claim depends on an interpretation of the CBA, the claim is pre-empted. [Citations.] [H]owever, . . . 'purely factual questions' about an employee's conduct or an employer's conduct and motives do not 'requir[e] a court to interpret any term of a collective-bargaining agreement.' [*Lingle* v. *Norge Division of Magic Chef, Inc., supra*] 486 U.S. at 407 . . . . The state-law retaliatory discharge claim turned on just this sort of purely factual question: whether the employee was discharged or threatened with discharge, and, if so, whether the employer's motive in discharging him was to deter or interfere with his exercise of rights under Illinois worker's compensation law.

"While recognizing that 'the state-law analysis might well involve attention to the same factual considerations as the contractual determination whether Lingle was fired for just cause,' [citation] the [*Lingle*] Court disagreed that 'such parallelism render[ed] the state-law analysis dependent upon the contractual analysis. [While the RLA may preempt state law in some instances to] ensure[] that federal law will be the basis for interpreting collective-bargaining agreements, [it] says nothing about the substantive rights a State may provide to workers when adjudication of those rights does not depend upon the interpretation of such agreements. In other words, even if dispute resolution pursuant to a collective-bargaining agreement, on the one hand, and state law, on the other, would require addressing precisely the same set of facts, as long as the state-law claim can be resolved without interpreting the agreement itself, the claim is "independent" of the agreement for . . . pre-emption purposes.' [*Lingle* v. *Norge Division of Magic Chef, Inc., supra,* 486 U.S.] at 408-410." (*Hawaiian Airlines, Inc.* v. *Norris, supra,* 512 U.S. at pp. 261-262 [129 L.Ed.2d at p. 217, 114 S.Ct. at pp. 2248-2249].)

In *Andrews* v. *Louisville & Nashville R. Co.* (1972) 406 U.S. 320 [32 L.Ed.2d 95, 92 S.Ct. 1562], the disagreement turned on the railroad's obligation to restore an injured employee to his duties. "The existence and extent of such an obligation . . . depend[ed] on the interpretation of the

collective bargaining agreement. Thus, [the employee's] claim, and the [railroad's] disallowance of it, stem[med] from differing interpretations of the collective bargaining agreement . . . [and thus, was] subject to the [RLA's] requirement that it be submitted to the Board for adjustment." (*Andrews* v. *Louisville & Nashville R. Co.*, *supra*, 406 U.S. at p. 324 [32 L.Ed.2d at p. at p. 99].) The ". . . state law claim of wrongful termination was pre-empted, *not* because the RLA broadly pre-empts state-law claims based on discharge or discipline, but because the employee's claim was firmly rooted in a breach of the CBA itself." (*Hawaiian Airlines, Inc.* v. *Norris*, *supra*, 512 U.S. at p. 257 [129 L.Ed.2d at p. 214, 114 S.Ct. at p. 2246].)

Similarly, in *Allis-Chalmers Corp.* v. *Lueck*, *supra*, 471 U.S. 202 ". . . the Court applied . . . pre-emption to a state-law claim for bad-faith handling of a worker's compensation claim because the duties the employer owed the employee, including the duty of good faith, were rooted firmly in the CBA. Its pre-emption finding was based on the fact that 'the right asserted not only derives from the contract, but is defined by the contractual obligation of good faith, [so that] any attempt to assess liability here inevitably will involve contract interpretation.' [Citation.]" (*Hawaiian Airlines, Inc.* v. *Norris*, *supra*, 512 U.S. at p. 260 [129 L.Ed.2d at p. 216, 114 S.Ct. at pp. 2247-2248].)[7]

### (2) *Ninth Circuit cases.*

The Ninth Circuit Court of Appeals has addressed the preemption issue in a few cases subsequent to *Norris*. In *Jimeno* v. *Mobil Oil Corp.* (9th Cir. 1995) 66 F.3d 1514, an employee was discharged after a physician found there was a potential for injury because of a physical disability. Jimeno brought suit alleging employment discrimination based upon physical disability, in violation of the California Fair Employment and Housing Act (FEHA). "Jimeno claimed that Mobil terminated him because of his non-work-related developmental defect, which required only minimal accommodation to avoid a risk of injury, and not, as Mobil asserted, because of a work-related back injury that might occasionally be aggravated by his continuing to work as a mechanic." (*Id.* at p. 1519.)

In evaluating if Jimeno's allegations were dependent upon an independent right or involved the interpretation of the collective bargaining agreement

---

[7]*Norris* recognized that although *Lingle* involved the Labor Management Relations Act (LMRA) and not the RLA, the two preemption standards are virtually identical and converge. (*Hawaiian Airlines, Inc.* v. *Norris*, *supra*, 512 U.S. at pp. 260, 263 & fn. 9 [129 L.Ed.2d at pp. 215-216, 218, 114 S.Ct. at pp. 2247, 2249]; *Hirras* v. *National R.R. Passenger Corp.* (5th Cir. 1995) 44 F.3d 278, 281, fn. 5, appeal after remand, 95 F.3d 396.) *Allis-Chalmers* also involved the LMRA, section 301 (29 U.S.C.A. § 185).

and thus preempted by the LMRA, the Ninth Circuit used a three-part inquiry: " '[The] court must consider (1) whether the CBA contains provisions that govern the actions giving rise to a state claim, and if so, (2) whether the state has articulated a standard sufficiently clear that the state claim can be evaluated without considering the overlapping provisions of the CBA, and (3) whether the state has shown an intent not to allow its prohibition to be altered or removed by private contract. A state law will be preempted only if the answer to the first question is "yes," and the answer to either the second or third is "no." ' " (*Jimeno* v. *Mobil Oil Corp.*, *supra*, 66 F.3d at p. 1523, citing the pre-*Norris* case of *Miller* v. *AT & T Network Systems* (9th Cir. 1988) 850 F.2d 543, 548.)

*Jimeno* first concluded the employee's prima facie case could be considered without construing the collective bargaining agreement. Even though the agreement contained a provision dealing with physical disability determinations, it was silent regarding "possible management responses when an employee is determined to be unfit to continue in a position without work restrictions." (66 F.3d at p. 1524.) Additionally, the collective bargaining agreement did not include provisions covering Mobile's defense relating to reasonable accommodation. Thus, the labor agreement did not ". . . serve as a measuring rod in determining whether Mobil acted reasonably in its blanket policy of refusing to make any adjustments to employee workload or work environment in order to accommodate those with work restrictions." (*Ibid.*) The collective bargaining agreement fell "short of establishing a comprehensive framework for challenging" (*ibid.*) procedures to assess an employee's physical fitness for the job.

With regard to the second prong of the analysis, *Jimeno* concluded the state had articulated clear statutory standards to enable the state claim to be evaluated without considering the overlapping provisions of the collective bargaining agreement. The employee did not claim Mobil breached the contractual agreement in the ". . . way that the company administered the provisions of the CBA regarding evaluation of physical fitness or availability of the grievance process" (66 F.3d at p. 1526), claims which would be preempted. Rather, the employee challenged Mobil's unilateral policy of ignoring state law requirements to accommodate disabled employees. Jimeno's claim of discrimination could be evaluated without reference to the bargaining agreement, even though the factual inquiry dealt with the same underlying factual situation. The state regulation specified a number of factors to be considered in assessing hardship on the employer; thus the collective bargaining agreement was peripheral to the evaluation.

With regard to the third prong of the test, *Jimeno* concluded the FEHA explicitly established the right to employment without discrimination. (*Jimeno* v. *Mobil Oil Corp.*, *supra*, 66 F.3d at pp. 1527-1528.)

*Jimeno* concluded that the FEHA claim required a pure factual inquiry, not requiring consultation with the collective bargaining agreement and the employee's state law claim for physical disability discrimination in employment was not preempted. (*Jimeno* v. *Mobil Oil Corp.*, *supra*, 66 F.3d at p. 1528.)

*Felt* v. *Atchison, Topeka & Santa Fe Ry. Co.* (9th Cir. 1995) 60 F.3d 1416 addressed a case virtually identical to Soldinger's lawsuit. The employee, Felt, alleged the railroad failed to accommodate his religious beliefs. Felt, a Seventh Day Adventist, was forbidden to work on Saturdays. He was laid off due to a reduction in work force, but during periods of employment, received protective pay. Thereafter, Felt was hired in a temporary position which required work on Saturdays. To accommodate Felt's religious beliefs, other employees volunteered to work his Saturday shift. When the position became permanent, Felt did not bid for the position believing if he did so, he would forfeit his protected status. However, when he failed to bid on the permanent position, the railroad denied him continued protected status. Felt filed a title VII complaint alleging the railroad failed to accommodate his religious preferences. The Ninth Circuit concluded the RLA did not preclude his independent action under title VII and rejected the argument the CBA's nondiscrimination rule controlled: "There is no doubt that Title VII rights, which the CBA never expressly references, 'exist independent of the collective bargaining agreement.' [Citation.] Because Title VII and the RLA, as applied to this railway agreement, each provide a mechanism for resolving a claim of religious discrimination does not mean that the Title VII rights are 'created or defined' by the CBA. [Citation.] Thus, whether Felt has a meritorious Title VII claim cannot be 'conclusively resolved' merely by consulting the CBA. The RLA does not preclude litigation of Title VII rights." (*Id.* at pp. 1419-1420.)

In *Espinal* v. *Northwest Airlines*, *supra*, 90 F.3d 1452, Espinal took a job with Northwest Airlines, governed by a collective bargaining agreement. During his training, Espinal learned he had diabetes. Thereafter, while Espinal was a probationary employee, the airlines rescinded its offer of employment, claiming Espinal had failed his employment physical. The Ninth Circuit concluded Espinal's discrimination claims were not preempted. Even though the bargaining agreement contained a physical fitness requirement, the collective bargaining agreement did not establish a comprehensive framework for challenging those determinations and did not establish a mechanism to accommodate disabled workers. Thus, it would not serve as a measuring rod to determine if the defendant acted reasonably. Espinal's accusation of a failure to accommodate his physical disability ". . . can be analyzed entirely apart from the CBA. This is true 'even though

the factual inquiry [under the FEHA] deals with the same underlying factual situation that is governed by [the CBA's] fitness examination provisions.' [Citation.].)" (*Id.* at p. 1457.) Moreover, the employee's disability discrimination must be analyzed in accordance with the FEHA's clear statutory and regulatory standards. (*Ibid.*) Finally, a private contract could not alter the public policy delineated in the FEHA's express provisions prohibiting discrimination based on physical handicap. (*Id.* at p. 1458.)[8]

In contrast, Espinal's claims against the airlines for breaching the employment contract were preempted. "In formally accepting his offer of employment, Espinal signed a contract indicating that his employment would be covered by a CBA. Thus, even assuming Espinal had an enforceable hiring contract with [the defendant], the CBA superseded that agreement to the extent that the contracts differed. . . . Accordingly, Espinal's only contractual remedies lie in the grievance procedures set forth under the CBA." (90 F.3d at p. 1459.)

The most recent Ninth Circuit case is *Fennessy* v. *Southwest Airlines* (9th Cir. 1996) 91 F.3d 1359. In *Fennessy* the Ninth Circuit concluded an employee's claim he was discharged in retaliation for his union organizing activities was not a minor dispute and thus not preempted.

 b. *Soldinger's causes of action based on disparate treatment and retaliation (Gov. Code, § 12940) are not preempted.*

■ Northwest Airlines contends Soldinger's allegations of disparate treatment and retaliation are preempted by the RLA. This contention is not persuasive.

In order to determine whether Soldinger's causes of action are minor disputes dependent upon an interpretation of the CBA, we must examine the basis of her causes of action and the elements she must prove. (Cf. *Lingle* v. *Norge Division of Magic Chef, Inc.*, *supra*, 486 U.S. at p. 407 [100 L.Ed.2d at pp. 419-420].)

Soldinger alleges Northwest Airlines discriminated against her by treating her differently from other employees and retaliating against her for taking legal action to enforce her rights. Her causes of action are premised upon the FEHA (Gov. Code, § 12900 et seq.). This act establishes freedom from job

---

[8]Compare *Wharf* v. *Burlington Northern R. Co.* (9th Cir. 1995) 60 F.3d 631, 636-637, fn. 7 (even if employee's job description under the collective bargaining agreement becomes peripherally relevant, RLA does not preempt evaluation of damages); *Kozy* v. *Wings West Airlines, Inc.* (9th Cir. 1996) 89 F.3d 635, 639.

discrimination on specific grounds, including religious discrimination. (Gov. Code, § 12940, subd. (a).) It enunciates the state's public policy to eliminate discrimination by promoting "the right to seek and hold employment free of prejudice." (*Commodore Home Systems, Inc.* v. *Superior Court* (1982) 32 Cal.3d 211, 220 [185 Cal.Rptr. 270, 649 P.2d 912].)[9]

The FEHA prohibits employers from discharging, retaliating or otherwise discriminating against people on the basis of religion, in compensation, terms, conditions, or privileges of employment. (Gov. Code, § 12940.)

■ "To establish employment discrimination by disparate treatment, the employee must show the employer treated the employee differently because of the employee's race, color, religion, sex, or national origin. [Citations.] '[C]onceptually the theory of " '[d]isparate treatment' . . . is the most easily understood type of discrimination. The employer simply treats some people less favorably than others because of their race, color, religion, sex or national origin." [Citation.]' [Citation.]" (*Clark* v. *Claremont University Center*, *supra*, 6 Cal.App.4th at p. 658, fn. 3.)

To establish retaliation (Gov. Code, § 12940, subd. (f)) , the plaintiff must prove he or she was engaged in protected activity, the employer subjected him or her to an adverse employment action, there was a causal link between the protected activity and the employer's action and the defendant's proffered nonretaliatory explanation was a pretext for the illegal consequence. (*Flait* v. *North American Watch Corp.* (1992) 3 Cal.App.4th 467, 476, 479 [4 Cal.Rptr.2d 522].)

■ Here, Soldinger alleged she was treated differently from Christian employees. She also contends she was retaliated against because she brought forth an accusation of religious discrimination. These allegations can be evaluated apart from the CBA; they are not grounded in or based solely upon an interpretation of the CBA. Northwest Airlines's actions must be analyzed in accordance with FEHA's statutory and regulatory standards.

Soldinger's right to be free from religious discrimination relies upon substantive protections provided by California law. This right emanates from California's public policy prohibiting discrimination in the workplace. State law obligated Northwest Airlines not to terminate Soldinger's employment based upon discriminatory motives. The CBA did not establish a framework for challenging allegedly discriminatory behavior.

---

[9]"Although the state and federal antidiscrimination legislation 'differ in some particulars, their objectives are identical, and California courts have relied upon federal law to interpret analogous provisions of the state statute. [Citations.]' [Citation.]" (*Clark* v. *Claremont University Center* (1992) 6 Cal.App.4th 639, 662 [8 Cal.Rptr.2d 151].)

California law has established clear standards to evaluate Soldinger's allegations of discrimination and retaliation. The FEHA explicitly established the right to employment, free from discrimination. These rights exist independent of the CBA. Soldinger does not allege Northwest Airlines breached the CBA in operating the bidding procedures.

Further, the CBA, a private contract, cannot alter California's public policy prohibiting discrimination based upon religion.

Thus, even though the factual inquiry will necessarily include reference to the CBA, Soldinger's allegations of discrimination and retaliation exist independent of the CBA and are not preempted by the RLA.[10]

 c. *Northwest Airlines justification defense does not alter the conclusion.*

█ Northwest Airlines contends it was justified in its actions because it followed the CBA's bidding procedures and thus cannot be liable under the state's discrimination laws.

This exact argument was rejected in *Norris* which ". . . teaches that the possibility that reference may be made to a collective bargaining agreement in connection with a justification defense (there, the failure of Norris to sign the aircraft maintenance record) does not give rise to pre-emption of state-law tort claims. . . . [Citation.]" (*Gay* v. *Carlson, supra,* 60 F.3d at p. 88.) *Norris* stated: "[The airline pins its] hopes on the observation that '[w]here an employer asserts a contractual right to take the contested action, the ensuing dispute is minor if the action is *arguably justified* by the terms of the parties' collective-bargaining agreement.' [Citation.] [The airline argues] that this case involves a minor dispute because the termination of respondent was 'arguably justified' by the CBA's provision permitting termination for 'just cause.' This 'arguably justified' standard, however, was employed only for policing the line between major and minor disputes. Recognizing that accepting a party's characterization of a dispute as 'minor' ran the risk of undercutting the RLA's prohibition 'against unilateral imposition of new contractual terms,' [citation], the Court held that a dispute would be deemed minor only if there was a sincere, nonfrivolous argument that it turned on the application of the existing agreement, that is, if it was 'arguably justified' by

---

[10]Compare *Taggart* v. *Trans World Airlines, Inc., supra,* 40 F.3d 269 (wrongful termination based on handicap; no preemption), and *Westbrook* v. *Sky Chefs, Inc., supra,* 35 F.3d 316 (RLA does not preempt employee's wrongful discharge claim alleging retaliation lawsuit for filing a worker's compensation claim), with *Hogan* v. *Northwest Airlines, Inc.* (D.Minn. 1995) 880 F.Supp. 685 (preemption when suit turns on interpreting CBA to determine if employee had applied for a position).

that agreement. Obviously, this test said nothing about the threshold question whether the dispute was subject to the RLA in the first place." (*Hawaiian Airlines, Inc.* v. *Norris, supra,* 512 U.S. at pp. 265-266 [129 L.Ed.2d at pp. 219-220, 114 S.Ct. at pp. 2250-2251].)

While a potential defense may be relevant to the preemption discussion (*Jimeno* v. *Mobil Oil Corp., supra,* 66 F.3d at p. 1524), if the state law allegations turn on factual questions relating to the employee's conduct and the employer's conduct and motivation, the CBA is not being interpreted and the state law claim is not preempted. (*Prudential Ins. Co. of America Sales Prac. Litig.* (D.N.J. 1996) 924 F.Supp. 627, 647.) "[W]hen the meaning of contract terms is not the subject of dispute, the bare fact that a collective-bargaining agreement will be consulted in the course of state-law litigation plainly does not require the claim to be extinguished, [citation]." (*Livadas* v. *Bradshaw* (1994) 512 U.S. 107, 124 [129 L.Ed.2d 93, 110, 114 S.Ct. 2068, 2078], citing *Lingle* v. *Norge Division of Magic Chef, Inc., supra,* 486 U.S. at p. 413, fn. 12 [100 L.Ed.2d at p. 423].)

Thus, the fact that Northwest Airlines will argue its actions were justified does not result in preemption of Soldinger's allegations.

*2. Soldinger's failure to accommodate allegations are not preempted and the CBA did not satisfy Northwest Airlines's obligation to accommodate.*

 Northwest Airlines contends the RLA preempted Soldinger's charges Northwest Airlines failed to accommodate her religious beliefs. Northwest Airlines also contends the CBA's seniority system and bidding procedures, in themselves, demonstrated it accommodated Soldinger's religious beliefs. These contentions are not persuasive.

*a. The duty to accommodate.*

Pursuant to California Government Code section 12940, it is an unlawful employment practice to fail to reasonably accommodate a person's religious practices: "It shall be an unlawful employment practice . . . [f]or an employer . . . to discharge a person from employment . . . or to discriminate against a person . . . because of a conflict between the person's religious belief or observance and any employment requirement, unless the employer . . . demonstrates that it has explored any available reasonable alternative

means of accommodating the religious belief or observance . . . ." (Gov. Code, § 12940, subd. (j).)[11]

■ In evaluating an argument the employer failed to accommodate an employee's religious beliefs, the employee must establish a prima facie case that he or she had a bona fide religious belief, of which the employer was aware, that conflicts with an employment requirement. (1 Rossein, Employment Discrimination Law and Litigation (1996) § 3.2, p. 3-3.) No issues have been raised with regard to Soldinger's bona fide religious beliefs and it appears the parties concede these beliefs conflicted with an employment requirement.

Once the employee establishes a prima facie case, then the employer must establish it initiated good faith efforts to accommodate or no accommodation was possible without producing undue hardship. (1 Rossein, Employment Discrimination Law and Litigation, *supra*; *Heller* v. *EBB Auto Co.* (9th Cir. 1993) 8 F.3d 1433, 1438; *E.E.O.C.* v. *Hacienda Hotel* (9th Cir. 1989) 881 F.2d 1504, 1512.)

Any reasonable accommodation is sufficient to meet an employer's obligations. However, the employer need not adopt the *most* reasonable accommodation nor must the employer accept the remedy preferred by the employee. (*Ansonia Board of Education* v. *Philbrook* (1986) 479 U.S. 60, 68 [93 L.Ed.2d 305, 314-315, 107 S.Ct. 367].) The reasonableness of the employer's efforts to accommodate is determined on a case by case basis. What is reasonable for one employee may not be reasonable for another. (*Smith* v. *Pyro Min. Co.* (6th Cir. 1987) 827 F.2d 1081, 1085.) The obligation to search for an acceptable solution is bilateral. Employees also have the obligation to make a good faith effort to explore alternatives. (*Brener* v. *Diagnostic Center Hospital* (5th Cir. 1982) 671 F.2d 141, 145-146; *Smith* v. *Pyro Min. Co.*, *supra*, at p. 1085.)

"[O]nce it is determined that the employer has offered a reasonable accommodation, the employer need not show that each of the employee's proposed accommodations would result in undue hardship." (1 Rossein, Employment Discrimination Law and Litigation, *supra*, § 3.4(1), p. 3-7.) "[W]here the employer has already reasonably accommodated the employee's religious needs, the . . . inquiry [ends]." (*Ansonia Board of Education* v. *Philbrook*, *supra*, 479 U.S. at p. 68 [93 L.Ed.2d at p. 315].)

---

[11]Like claims of discriminatory practice, California courts look to the federal cases interpreting title VII (42 U.S.C. § 2000e(j)) in evaluating failure to accommodate allegations. (E.g., *Best* v. *California Apprenticeship Council* (1984) 161 Cal.App.3d 626, 634 [207 Cal.Rptr. 863].)

If the employee proves a prima facie case and the employer fails to initiate an accommodation for the religious practices, the burden is then on the employer to prove it will incur an undue hardship if it accommodates that belief. (*Smith* v. *Pyro Min. Co., supra,* 827 F.2d at p. 1085; 1 Rossein, Employment Discrimination Law and Litigation, *supra,* § 3.4(3), p. 3-12; Cal. Code Regs., tit. 2, § 7293.3 ["An employer . . . shall make accommodation to the known religious creed of an . . . employee unless the employer . . . can demonstrate that the accommodation is unreasonable because it would impose an undue hardship."].) "[T]he extent of undue hardship on the employer's business is at issue only where the employer claims that it is unable to offer any reasonable accommodation without such hardship." (*Ansonia Board of Education* v. *Philbrook, supra,* 479 U.S. at pp. 68-69 [93 L.Ed.2d at p. 315].) "[A]n accommodation causes 'undue hardship' whenever that accommodation results in 'more than a *de minimis* cost' to the employer." (*Id.* at p. 67 [93 L.Ed.2d at pp. 313-314], original italics, citing *Trans World Airlines, Inc.* v. *Hardison* (1977) 432 U.S. 63, 84 [53 L.Ed.2d 113, 131, 97 S.Ct. 2264].)

The leading case on the duty to accommodate involving an employee governed by a collective bargaining agreement is *Trans World Airlines, Inc.* v. *Hardison, supra,* 432 U.S. 63. In *Hardison* the employee was subject to a seniority system contained in a collective bargaining agreement. Senior employees had first choice in a bidding system implemented by the union steward. The bidding system determined which employee would work particular shifts. Hardison's religion required him to refrain from working from sunset Friday to sunset Saturday. When he informed his supervisor of this tenet, the problem was temporarily resolved when Hardison was transferred to the 11 p.m. to 7 a.m. shift. The problem reappeared, however, when his job changed. The airlines (TWA) agreed to permit the union to seek a change of work assignments, but the union was unwilling to violate the collective bargaining agreement's seniority provisions. TWA rejected other alternatives because they would have impaired functions critical to its operation. When an accommodation was not reached, Hardison refused to work on Saturdays and eventually he was discharged. The trial court made factual findings TWA could not have done more without violating the seniority system or incurring substantial costs. (*Id.* at pp. 77, 83, fn. 14 [53 L.Ed.2d at pp. 126-127, 130].)

In *Hardison,* TWA could not be faulted because the unwillingness to work out a shift or job swap came not from itself, but from the union. (*Trans World Airlines, Inc.* v. *Hardison, supra,* 432 U.S. at pp. 78-79 [53 L.Ed.2d at pp. 127-128].) The duty to accommodate did not require TWA to "take steps inconsistent with the otherwise valid agreement." (*Id.* at p. 79 [53 L.Ed.2d at

pp. 127-128.) TWA was not required "to carve out a special exception to its seniority system in order to help Hardison to meet his religious obligations." (*Id.* at p. 83 [53 L.Ed.2d at p. 130], fn. omitted.) The seniority system represented "a significant accommodation to the needs, both religious and secular, of all of TWA's employees." (*Id.* at p. 78 [53 L.Ed.2d at p. 127].) All proposed alternatives would have infringed either on other employee's rights under the collective bargaining agreement or involved some cost to TWA which was more than de minimis. (*Id.* at pp. 80-81, 84 [53 L.Ed.2d at pp. 128-129, 131].) While concluding the employee had been accommodated, *Hardison* noted that neither the CBA nor a seniority system could be used to violate an employer's obligation to accommodate. (*Id.* at p. 79 [53 L.Ed.2d at pp. 127-128].)

 b. *Soldinger's allegations of a failure to accommodate are not preempted by the RLA.*

 ▮▮▮ Northwest Airlines contends Soldinger's allegations of a failure to accommodate are preempted by the RLA. This contention lacks merit.

 As discussed above, the RLA preempts a state law cause of action if the CBA needs to be interpreted or applied in evaluating that cause of action. (*Hawaiian Airlines, Inc.* v. *Norris, supra*, 512 U.S. at pp. 255-256 [129 L.Ed.2d at pp. 212-213, 114 S.Ct. at p. 2245].) If the accommodation dispute involves rights and duties defined by the CBA, they are minor disputes and thus preempted.

 Here, Soldinger's accommodation contention does not require an interpretation or application of the CBA to make the required factual inquiry. The dispute does not involve rights created by the CBA. Soldinger is not invoking contract-based rights. Soldinger does not suggest there was a failure to accommodate because Northwest Airlines improperly administered the CBA or the bidding procedures. Rather, she contends Northwest Airlines failed to take any steps to accommodate her religious beliefs, thus denying her statutory rights. " '[T]he bare fact that a collective-bargaining agreement will be consulted in the course of state-law litigation plainly does not require the claim to be extinguished.' [citation]" when the meaning of the contract terms are not in dispute. (*Hawaiian Airlines, Inc.* v. *Norris, supra*, 512 U.S. at p. 261, fn. 8 [129 L.Ed.2d at p. 216, 114 S.Ct. at p. 2248].) Even though the discussion will involve reference to the CBA, Soldinger's rights are to be analyzed according to statutory obligations, obligations which are evaluated without considering provisions of the CBA. Soldinger's rights of accommodation do not derive from the CBA, which is silent on Northwest Airlines's obligations to accommodate an employee's religious beliefs and which does not provide a comprehensive framework for evaluating such charges.

Further, California's anti-discrimination statutes, which include Government Code section 12940, subdivision (j), demonstrate California's intent not to allow its laws to be circumvented by private contracts. Lastly, as shown above, the argument that Northwest Airlines was justified in its actions does not alter the preemption discussion. Thus, Soldinger's accommodation claims are not preempted.

### c. *On the facts before us, we cannot conclude Northwest Airlines accommodated Soldinger.*

■ Northwest Airlines contends, as a matter of law, it accommodated Soldinger. This contention is not persuasive. Unlike *Hardison*, this case comes to us upon a summary judgment, where our responsibility is to determine if there are triable issues of fact. (*PMC, Inc.* v. *Saban Entertainment, Inc.*, *supra*, 45 Cal.App.4th at p. 590.) From the record before us we must conclude there are triable issues of fact.

There are no facts demonstrating Northwest Airlines initiated any steps to accommodate Soldinger. After Soldinger informed Northwest Airlines of her bona fide religious beliefs and that her work schedule conflicted with these beliefs, Northwest Airlines did nothing. When Soldinger asked Holme for the day off, Holme took no action other than stating if Soldinger did not appear for work, she would be fired. Northwest Airlines did not inquire as to whether a change in work assignments would have been acceptable to the Union. It did not offer any suggestions to Soldinger as to how she might be accommodated. It did not make any inquiries to other employees to determine if work days could be swapped, something which was done on behalf of another employee, Chris Canale. It did not consult with its attorneys to determine if a swap was possible under the CBA, a swap which would not infringe on another employee's seniority rights. These alternatives, or a myriad of others, might have been considered reasonable efforts to accommodate Soldinger's religious beliefs, had they been attempted. (Compare with *Cook* v. *Lindsay Olive Growers* (9th Cir. 1990) 911 F.2d 233, 240-241 [employer's attempts to accommodate were reasonable].)

Since Northwest Airlines did not explore any available alternatives, it violated its statutory obligation to accommodate unless Northwest Airlines established that any reasonable accommodation would have caused it an undue hardship, violated the CBA or violated the seniority rights of other employees.

However, the only facts before us are that Soldinger's responsibilities were covered "with ease." Otherwise, we have no information that had

Northwest Airlines accommodated Soldinger it would have incurred financial or other costs. Unlike *Hardison*, we do not know if proposed alternatives would have hampered Northwest Airlines's operations or forced it to incur additional costs. Thus, we cannot conclude an accommodation would have caused Northwest Airlines undue hardship.

Further, we have no facts to show that had Northwest Airlines accommodated Soldinger the CBA would have been violated or other employees would have been deprived of their rights under the CBA. Employers need not take steps inconsistent with a neutral application of a seniority system to accommodate another's religious beliefs. (*Trans World Airlines, Inc.* v. *Hardison, supra*, 432 U.S. at pp. 80-81 [53 L.Ed.2d at pp. 128-129].) To do so would deprive other employees of their rights under the agreement. Additional facts must be developed before we can conclude Northwest Airlines accommodated Soldinger.

> d. *The CBA, by itself, did not constitute an accommodation.*

■ Northwest Airlines contends it was not required to take any steps to accommodate Soldinger because the CBA, in the abstract, satisfied its duty to accommodate. Thus, Northwest Airlines argues the CBA constituted an accommodation, as a matter of law. On the facts before us, we reject Northwest Airlines's contention.

The Ninth Circuit has consistently held that determining when an accommodation is reasonable depends upon the circumstances "under which a particular accommodation may cause hardship that is 'undue.' " (*Anderson* v. *General Dynamics Convair, etc.* (9th Cir. 1978) 589 F.2d 397, 400, sub. opn. 648 F.2d 1247.) Such ". . . decisions must be made in the particular factual context of each case because the decision ultimately turns on the reasonableness of the conduct of the parties under the circumstances of each case. [Citation.]" (*Ibid.*; accord, *Hudson* v. *Western Airlines, Inc.* (9th Cir. 1988) 851 F.2d 261, 266; *United States* v. *City of Albuquerque* (10th Cir. 1976) 545 F.2d 110, 114.) "Whether an employer has met its statutory burden to initiate good-faith efforts to accommodate an employee's religious beliefs is a question of fact." (*E.E.O.C.* v. *Hacienda Hotel, supra*, 881 F.2d at p. 1512.)

Beginning with this premise, the Ninth Circuit rejects employers' arguments, based upon *Hardison*, that an employer bound by a union contract cannot be liable on failure to accommodate allegations. (*E.E.O.C.* v. *Hacienda Hotel, supra*, 881 F.2d at p. 1513.) Employers may not use a collective-bargaining agreement ". . . as a shield against its statutory obligation to reasonably accommodate its employees' religious needs. '[N]either a collective-bargaining agreement nor a seniority system may be employed to

violate [title VII]. . . .' [*Trans World Airlines, Inc.* v. *Hardison, supra,* 432 U.S. at p. 79 . . . .]" (*E.E.O.C.* v. *Hacienda Hotel, supra,* 881 F.2d at p. 1513.)

In *Hudson* v. *Western Airlines, Inc., supra,* 851 F.2d 261 the Ninth Circuit faced an airline employee's argument the employer failed to accommodate his religious beliefs. The employee argued the lower court erred in finding there was an accommodation because the nondiscriminatory collective bargaining agreement could not be viewed in the abstract to prove there was a reasonable accommodation. *Hudson* rejected the employee's assertion. *Hudson* stated that the trial court had not looked at the bargaining agreement in the abstract: "[t]he record demonstrates that rather than focusing on the collective bargaining agreement in the abstract, the [trial] court discussed the agreement as it applied to [the employee's] case, and discussed the conduct of [the airline] and [the employee] under the agreement. The [trial] court correctly applied the law to the facts." (*Id.* at p. 266.)

In reaching a contrary result, cases from other circuits also rely upon *Hardison.* (E.g., *Mann* v. *Frank* (8th Cir. 1993) 7 F.3d 1365, 1369; *Cook* v. *Chrysler Corp.* (8th Cir. 1992) 981 F.2d 336, 339.) These cases interpret *Hardison* as holding a neutral bidding system, in itself, provides a reasonable accommodation. However, these cases fail to recognize *Hardison* was decided after a trial and *Hardison* relied upon detailed factual findings made in the district court. Further, these cases do not address the fact that this was not the issue before the Supreme Court in *Hardison. Hardison* concluded title VII did not require ". . . an employer and union who have agreed on a seniority system to deprive senior employees of their seniority rights in order to accommodate a junior employee's religious practices . . ." (*Trans World Airlines, Inc.* v. *Hardison, supra,* 432 U.S. at p. 83, fn. 14 [53 L.Ed.2d at p. 130]) and each conceivable accommodation would have resulted in undue hardship. It further held the airline was not required to bear more than a de minimis cost in order to accommodate the employee. (*Id.* at p. 84 [53 L.Ed.2d at p. 131].) When *Hardison* discussed the seniority system, it did so in light of the facts before it, the fact that TWA had tried to accommodate its employees, but its efforts were thwarted, and the fact that to force TWA to violate the neutral system would deprive others of their rights under that neutral system. (*Id.* at pp. 78-79 [53 L.Ed.2d at pp. 127-28].) *Hardison* did not "consider the bounds of a prima facie case in the religious accommodation context." (*Ansonia Board of Education* v. *Philbrook, supra,* 479 U.S. at p. 67 [93 L.Ed.2d at p. 314].) While bidding procedures in a collective bargaining agreement may generally be reasonable, factual findings can be required to determine the manner in which the agreement has been applied. (Cf. *id.* at p. 70 [93 L.Ed.2d at pp. 315-316].)

Additionally, while some federal cases suggest a neutral rotating shift, in itself, constitutes an accommodation, they have done so in circumstances where the employer initiated some action toward accommodation or suggested to the employee he or she was free to try and make other arrangements. (E.g., *Beadle* v. *Hillsborough County Sheriff's Dept.* (11th Cir. 1994) 29 F.3d 589.)

Other courts have refused to find fault with an employer who does nothing to accommodate an employee other than the neutral rotating shift because to do otherwise would have resulted in an undue hardship to the employer. (*Beadle* v. *City of Tampa* (11th Fir. 1995) 42 F.3d 633.)

Unlike *Hardison,* this case comes to us upon summary judgment and there was no showing Northwest Airlines explored any alternatives to accommodate Soldinger. Further, there are no facts upon which we can conclude accommodating Soldinger would have denied other employees their rights under the collective bargaining agreement. (Compare with *Trans World Airlines, Inc.* v. *Hardison, supra,* 432 U.S. 63.)

Thus, here there are triable issues of fact. (*Hudson* v. *Western Airlines, Inc., supra,* 851 F.2d at pp. 265-266; cf. *Turpen* v. *Missouri-Kansas-Texas R. Co.* (5th Cir. 1984) 736 F.2d 1022 [factual findings upheld].)[12] The record before us is not sufficiently clear to conclude, as a matter of law, Northwest Airlines accommodated Soldinger. We cannot make the required factual finding. (Cf. *Ansonia Board of Education* v. *Philbrook, supra,* 479 U.S. at pp. 70-71 [93 L.Ed.2d at pp. 315-316].)

3. *Soldinger's cause of action for intentional infliction of emotional distress is not preempted.*

 Northwest Airlines contends Soldinger's cause of action for intentional infliction of emotional distress is preempted by the RLA. This contention is not persuasive.

 The preemption analysis for an intentional infliction of emotional distress cause of action also rests upon the facts of each case. (E.g., *Hirras* v. *National R.R. Passenger Corp., supra,* 44 F.3d 278.) We look to the elements of the tort (*Lingle* v. *Norge Division of Magic Chef, Inc., supra,* 486 U.S. at

---

[12]We do not mean to suggest summary judgment could never be obtained when an employer relies upon a collective bargaining agreement in denying an employee's request for time off for religious observance. If facts are properly developed in a summary judgment motion, particularly because an employer need only prove it would have incurred a de minimis burden had it accommodated the employee's religious beliefs, summary judgment may be granted in the appropriate case.

p. 407 [100 L.Ed.2d at pp. 419-420]), as some emotional distress allegations may be preempted, while others are not. (Cf. *Lightning* v. *Roadway Exp., Inc.* (11th Cir. 1995) 60 F.3d 1551, 1557.)

In California, a plaintiff must prove extreme and outrageous conduct with the intent of causing, or reckless disregard of the probability of causing, severe emotional distress, which causes the plaintiff to suffer such distress. (*Molko* v. *Holy Spirit Assn.* (1988) 46 Cal.3d 1092, 1120 [252 Cal.Rptr. 122, 762 P.2d 46].) Where reasonable people may differ, the trier of fact determines the reasonableness of the behavior creating the distress. (*Id.* at p. 1123; *Alcorn* v. *Anbro Engineering, Inc.* (1970) 2 Cal.3d 493, 499 [86 Cal.Rptr. 88, 468 P.2d 216].) "Because the tort requires inquiry into the appropriateness of the defendant's behavior, the terms of the CBA can become relevant in evaluating whether the defendant's behavior was reasonable." (*Miller* v. *AT & T Network Systems, supra*, 850 F.2d at p. 550; accord, *Lightning* v. *Roadway Exp., Inc., supra*, 60 F.3d at p. 1557.) "Nonetheless, 'the "extreme and outrageous" character of certain sorts of employer conduct may be evident without reference to the terms of the collective bargaining agreement. . . .' [Citation.]" (*Lightning* v. *Roadway Exp., Inc., supra*, at p. 1557.) If the factual questions about the employer's conduct and motives and the employee's conduct do not involve interpreting the CBA, an intentional infliction of emotional distress cause of action, like others, is not preempted. (*Hawaiian Airlines, Inc.* v. *Norris, supra*, 512 U.S. at pp. 255-256, 262-264, 266 [129 L.Ed.2d at pp. 212-213, 217-218, 220, 114 S.Ct. at pp. 2245, 2249, 2251]; e.g., *Truex* v. *Garrett Freightlines, Inc.* (9th Cir. 1985) 784 F.2d 1347; cf. *Moreau* v. *San Diego Transit Corp.* (1989) 210 Cal.App.3d 614 [258 Cal.Rptr. 647] [termination decision hinges on determining "good cause," a factual inquiry inextricably intertwined with CBA].)[13]

For example, in *Hirras* v. *National R.R. Passenger Corp., supra*, 44 F.3d 278 the employee alleged intentional infliction of emotional distress based upon allegations the employer failed to provide a nonhostile workplace. The Fifth Circuit rejected the employer's argument an interpretation of the CBA was required in order to evaluate whether the harassment was outrageous as

---

[13]Northwest Airlines cites *Olguin* v. *Inspiration Consol. Copper Co.* (9th Cir. 1984) 740 F.2d 1468. However, *Olguin* was decided before *Allis-Chalmers Corp.* v. *Lueck, supra*, 471 U.S. 202 and *Hawaiian Airlines, Inc.* v. *Norris, supra*, 512 U.S. 246 [129 L.Ed.2d 203, 114 S.Ct. 2239], used an incorrect test, and is no longer binding precedent. The precedential value of *Cook* v. *Lindsay Olive Growers, supra*, 911 F.2d 233, cited by both parties, is questionable. While instructive in demonstrating some allegations in an employee's lawsuit against an employer may be preempted whereas others are not, it was also decided before *Norris*. Thus, it did not address whether the preemption analysis is altered when the defendant argues the CBA justified its actions. We note, however, its discussion on the accommodation issue is still binding precedent.

it depended upon whether the employer had met CBA standards. "The terms of the CBA at issue in this case are not relevant to the resolution of Hirras' claim because the CBA contains no provision related to sexual harassment, much less any provision that could be interpreted to give [the employer] the right to accommodate sexual harassment or Hirras the right to work in a non-hostile environment." (*Id.* at pp. 283-284, fns. omitted.) Similarly, in *Lightning* v. *Roadway Exp., Inc., supra,* 60 F.3d 1551, an employee was verbally abused and spat on. The Eleventh Circuit concluded that even though the claim revolved around employer conduct arguably sanctioned by the labor contract, the claim was not preempted.[14]

*Fry* v. *Airlines Pilots Ass'n. Intern., supra,* 88 F.3d 831 is also instructive. In this Tenth Circuit case the dispute involved accusations by former pilots against their union and an airline, the pilots' ex-employer. The pilots alleged poststrike harassment, asserting the union and airline acquiesced in persecuting plaintiffs to appease those who had not participated in the strike. *Fry* concluded the emotional distress cause of action against the airlines was preempted. The alleged outrageous conduct was ". . . inextricably bound up with agreements and promises made to protect, and then actions allegedly forsaking, the plaintiffs . . . . 'Only by comparing the protective system promised by [the airlines] with the system put into place by the various labor agreements between [the airlines] and [the union] can the fact finder determine whether [the airlines] breached its contract with the plaintiffs, whether [the airlines'] representations were false, and whether [the airlines'] conduct was outrageous.' " (*Id.* at pp. 836-837.) In contrast, plaintiffs' emotional distress claims against the union were not preempted because the "objectives, motives, and resulting conduct by [the union] and [the airline] . . . were different. . . ." (*Id.* at p. 841.) Even though the labor agreements called for disciplinary procedures and responsibilities, ". . . it is unnecessary in this case to interpret the CBA or other agreements to find liability for outrageous conduct[,] the alleged conduct here does not need to be explained in terms of the contract." (*Id.* at p. 841.) " 'The mere fact that [plaintiffs] might be able to grieve [the union's] conduct under procedures provided in the collective bargaining agreement is not sufficient in itself to conclude that [plaintiffs'] tort claims are preempted. The crucial [inquiry] is not whether a claim can be taken through the grievance process but whether the state law tort claim being asserted purports to give meaning to the terms of the labor contract.' " (*Ibid.*)

As to Soldinger's intentional infliction of emotional distress cause of action, Soldinger alleged Northwest Airlines knew of the significance of

---

[14]There are a multitude of federal cases discussing federal preemption as it applies to an intentional infliction of emotional distress cause of action. (See cases cited in *Johnson* v. *Beatrice Foods Co.* (10th Cir. 1990) 921 F.2d 1015, 1021, and cases cited in the footnote on page 1557 of *Lightning* v. *Roadway Exp., Inc., supra,* 60 F.3d 1551.)

Passover to her, but refused to allow her to observe the holiday in accordance with her religious beliefs, insisting she work on the holiday, and by terminating her employment when she refused to do so, even though it found a replacement for her and despite its knowledge Northwest Airlines did not punish similar behavior of Christians. The jury will have to determine if the conduct is "outrageous" in light of Northwest Airlines's rights, duties and obligations under the contract; however, an interpretation of the contract is not required. (*Hawaiian Airlines, Inc.* v. *Norris, supra,* 512 U.S. at p. 261, fn. 8 [129 L.Ed.2d at pp. 215-216, 114 S.Ct. at p. 2248].) These allegations do not require an interpretation of the CBA.

Contrary to Northwest Airlines's suggestion, the inquiry does not turn on whether it complied with Soldinger's request for time off. Soldinger does not contest the application of the CBA with regard to the bidding procedures. Nor does Soldinger suggest the bidding procedures were unfair. Rather, her emotional distress claims are based upon the allegations Northwest Airlines terminated her employment when she once did not appear for work, yet it did not punish similar behavior of Christians. The factual dispute will not involve the CBA's time-off mechanisms, but rather Northwest Airlines's motives for denying Soldinger's request to allow her to observe Passover and whether the airline treated Christians in a similar fashion. This does not involve an interpretation of the CBA, even though the CBA "contained provisions that could be interpreted to justify the termination." (*Hirras* v. *National R.R. Passenger Corp., supra,* 44 F.3d at p. 282.) The CBA does not govern the alleged offending behavior nor is the nature and scope of Northwest Airlines's duty found in the CBA. Further, there is no suggestion the alleged tortious conduct was permitted under the CBA. (Cf. *Galvez* v. *Kuhn* (9th Cir. 1991) 933 F.2d 773.)

While a grievance proceeding could determine if Soldinger was AWOL, it could not determine if Northwest Airlines considered Soldinger's religious beliefs in terminating Soldinger's employment. Thus, the factual inquiry at trial will be different from that conducted in any potential grievance proceeding. Since the agreement terms are not in dispute,[15] simply consulting the agreement does not eliminate Soldinger's state claim. (*Hawaiian Airlines, Inc.* v. *Norris, supra,* 512 U.S. at p. 261, fn. 8 [129 L.Ed.2d at pp. 215-216, 114 S.Ct. at p. 2248]; *Hirras* v. *National R.R. Passenger Corp., supra,* 44 F.3d at p. 283, fn. 10.)

---

[15]There appears to be a small factual dispute. Soldinger testified DAT time could be requested 30 days in advance. Steve Holme, the Northwest Airlines station manager, testified in the arbitration hearing DAT requests could not be made until 14 days in advance, on a first come, first served basis. This insignificant dispute will be resolved quickly and does not suggest the terms of the collective bargaining agreement are in dispute.

Thus, Soldinger's cause of action for intentional infliction of emotional distress is not preempted.[16]

### 4. *Soldinger exhausted her administrative remedies.*

 Northwest Airlines contends Soldinger failed to exhaust her administrative remedies with regard to her allegations of retaliation.[17] This contention is not persuasive.

#### a. *Relevant procedural events.*

The exhaustion argument makes relevant the following procedural chronology. Soldinger's first filed an administrative charge with the DFEH on April 12, 1991. Soldinger alleged she was discriminated against because of her religion and she was denied the right to take a day off to observe Passover, leading to a wrongful discharge. DFEH rejected the charge and on April 23, 1991, issued a right-to-sue letter. On April 23, 1992, Soldinger filed her civil complaint. She alleged four causes of action based upon allegations Northwest Airlines failed to accommodate her religious beliefs, discriminated against her and wrongfully terminated her employment. On June 30, 1993, Soldinger filed her second DFEH charge; that same day, DFEH issued a second right-to-sue letter. The second charge alleged Soldinger was denied promotions in retaliation for *"filing a previous charge of discrimination."* In September 1993, Soldinger amended her civil complaint. She reformulated her allegations into three causes of action, tortious discharge in violation of public policy, religious discrimination and intentional infliction of emotional distress. In the amended complaint, she reasserted her failure to accommodate and discrimination allegations. Additionally, Soldinger alleged that after she had returned to work, Northwest Airlines had retaliated against her by denying her a promotion in or about March 1992, denying her the ability to bid for vacation benefits in or about March 1992, and subjecting her to continuing anti-Semitic remarks, hostility and harassment.

#### b. *Relevant law.*

 "It is fundamental that '. . . where an administrative remedy is provided by statute, relief must be sought from the administrative body and

---

[16]In response to one of our inquiries, Northwest Airlines argued Soldinger's cause of action for intentional infliction of emotional distress is barred by the exclusive remedy of workers' compensation. Since this was raised for the first time in the letter brief, we need not address it. (*Barnes* v. *Litton Systems, Inc.* (1994) 28 Cal.App.4th 681, 685, fn. 4 [33 Cal.Rptr.2d 562]; *Scott* v. *CIBA Vision Corp.* (1995) 38 Cal.App.4th 307, 322 [44 Cal.Rptr.2d 902].)

[17]Northwest Airlines does not make this argument regarding Soldinger's allegations for failure to accommodate religious beliefs or for disparate treatment.

this remedy exhausted before the courts will act.' [Citation.]" (*Okoli* v. *Lockheed Technical Operations Co.* (1995) 36 Cal.App.4th 1607, 1612 [43 Cal.Rptr.2d 57].)[18] The purpose of filing a charge with an administrative agency prior to filing a civil lawsuit is to enable that agency to investigate the charges and attempt to obtain voluntary compliance with the law. When submitting the charge, claimants are not held to specify the charges with literary exactitude. (*Baker* v. *Children's Hospital Medical Center* (1989) 209 Cal.App.3d 1057, 1064 [257 Cal.Rptr. 768], citing *Sanchez* v. *Standard Brands, Inc.* (5th Cir. 1970) 431 F.2d 455.) In the case of Soldinger's claim for retaliation, an administrative remedy is provided by the FEHA (Gov. Code, § 12900 et seq.), which creates an administrative agency, the DFEH. (*Commodore Home Systems, Inc.* v. *Superior Court, supra,* 32 Cal.3d at p. 213; *Sandhu* v. *Lockheed Missiles & Space Co.* (1994) 26 Cal.App.4th 846, 851 [31 Cal.Rptr.2d 617].)

▬▬ ▬▬ The issue before us revolves around the fact that Soldinger's charges submitted to DFEH do not duplicate the allegations in her amended civil complaint. Some authorities state the more specific the original charge filed with the administrative agency, the less likely a civil lawsuit may be expanded into other areas. (*Okoli* v. *Lockheed Technical Operations Co., supra,* 36 Cal.App.4th at p. 1617.) However, even if this is an accurate statement of the law, all recognize that a DFEH charge "is not intended as a limiting device." (*Watson* v. *Department of Rehabilitation* (1989) 212 Cal.App.3d 1271, 1288 [261 Cal.Rptr. 204].) Incidents not described in a DFEH charge can be included in the subsequently filed lawsuit if they would necessarily have been discovered by investigation of the charged incidents, i.e., if the allegations in the civil complaint were "like or related" to those specified in the DFEH charge. (*Okoli* v. *Lockheed Technical Operations Co., supra,* at p. 1615; *Sanchez* v. *Standard Brands, Inc., supra,* 431 F.2d at p. 466.) "Essentially, if an investigation of what *was* charged in the [administrative agency filing] would necessarily uncover other incidents that were not charged, the latter incidents could be included in a subsequent [civil] action." (*Okoli* v. *Lockheed Technical Operations Co., supra,* 36 Cal.App.4th at p. 1615, original italics.)

 c. *Soldinger complied with the requirements to exhaust her administrative remedies.*

Northwest Airlines contends Soldinger did not exhaust her administrative remedies. Northwest Airlines asserts Soldinger cannot go forward with

---

[18]Soldinger was not required to exhaust her administrative remedies with regard to non-statutory causes of action. (*Rojo* v. *Kliger* (1990) 52 Cal.3d 65, 83, 88 [276 Cal.Rptr. 130, 801 P.2d 373]; *Farmers Ins. Exchange* v. *Superior Court* (1992) 2 Cal.4th 377, 396 [6 Cal.Rptr.2d 487, 826 P.2d 730].) In light of our conclusion Soldinger exhausted her administrative remedies, we need not discuss this aspect of the exhaustion doctrine.

her retaliation claims because her DFEH charges did not bring forth the same or similar allegations as contained in her civil suit. In making this argument, Northwest Airlines notes Soldinger's second DFEH charge alleged "retaliation for filing a previous charge of discrimination . . . ." whereas Soldinger's amended civil complaint stated there was retaliation "for bringing this lawsuit."

Northwest Airlines's argument might be convincing if Soldinger's charges of retaliation all occurred after the filing of her lawsuit and none had ever been brought to the attention of DFEH. (*Okoli* v. *Lockheed Technical Operations Co.*, *supra*, 36 Cal.App.4th 1607 [employee cannot assert retaliation occurring after filing DFEH charge when administrative charges had only alleged discriminatory denial of promotion].) However, Soldinger's second DFEH charge alleging retaliation was filed after her initial April 1992 civil complaint was filed. Once DFEH issued its right-to-sue letter with regard to that second charge, Soldinger then amended her civil lawsuit to add retaliation allegations. Even if the second DFEH charge did not specifically include contentions of retaliation based upon *filing the civil lawsuit*, it did allege Northwest Airlines retaliated against Soldinger because she had accused Northwest Airlines of discrimination. Given the facts of this case, DFEH reasonably would have investigated all aspects of Soldinger's claims of retaliation in investigating her second charge. The incidents of retaliation had either already occurred (denial of promotions and the ability to bid on vacation benefits) or were ongoing (continual anti-Semitic remarks, hostility and harassment).

Northwest Airlines also suggests Soldinger's retaliation allegations contained in her civil lawsuit cannot go forward because they asserted that in March 1992 she was retaliated against for filing "this suit," yet the lawsuit had not as yet been filed. However, the import of Soldinger's retaliation claims against Northwest Airlines was that Northwest Airlines retaliated against Soldinger for raising accusations of discrimination. In the context of this case, the investigation would have revolved around the retaliatory acts, not whether they were in response to filing the DFEH charge, as compared to filing the civil lawsuit.

Since Soldinger's allegations in her amended civil complaint were like or reasonably related to her charge (*Baker* v. *Children's Hospital Medical Center*, *supra*, 209 Cal.App.3d 1057; cf. *Sandhu* v. *Lockheed Missiles &*

*Space Co.*, *supra*, 26 Cal.App.4th 846), Soldinger exhausted her administrative remedies.[19]

## DISPOSITION

The judgment in favor of Northwest Airlines is reversed. Costs on appeal are awarded to Geraldine Soldinger.

Klein, P. J., and Kitching, J., concurred.

Respondent's petition for review by the Supreme Court was denied March 12, 1997.

---

[19]Northwest Airlines also argues some of the alleged discriminatory acts were time barred as they occurred more than one year prior to the filing of the discrimination charge. (Gov. Code, § 12960.) However, Northwest Airlines raises this argument for the first time in its letter brief filed in response to one of our inquiries; thus, we need not address it. (*Barnes* v. *Litton Systems, Inc.*, *supra*, 28 Cal.App.4th at p. 685, fn. 4; *Scott* v. *CIBA Vision Corp.*, *supra*, 38 Cal.App.4th at p. 322.)